UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

       Plaintiff,

and

MELISSA EVERETTE and
FONTELLA LUTHER,

       Intervening Plaintiffs,

v.                       CASE No. 8:05-CV-1813-T-17TGW

DIVERSIFIED BEHAVIORAL
HEALTH SOLUTIONS, d/b/a,
CENTRAL FLORIDA YOUTH
SERVICES,

       Defendant.
_____

RODNEY JONES,

       Plaintiff,

v.                       CASE No. 8:05-CV-2358-T-17TGW

DIVERSIFIED BEHAVIORAL
HEALTH SOLUTIONS, d/b/a,
CENTRAL FLORIDA YOUTH
SERVICES,

       Defendant.
_____

<u>REPORT AND RECOMMENDATION</u>

These are two related actions against an employer alleging sexual harassment and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, <u>et</u> <u>seq</u>., Title I of the Civil Rights Act of 1991, 42 U.S.C. 1981a, and the Florida Civil Rights Act, <u>Fla</u>. <u>Stat</u>., 760.01, <u>et</u> <u>seq</u>.  The defendant failed to defend these actions.  Consequently, a default was entered in both cases.  An evidentiary hearing was subsequently held to determine the amount of damages to which the individual plaintiffs are entitled.  Based upon the evidence adduced at the hearing, I recommend that judgment be entered for plaintiff Melissa Whittaker in the amount of $62,386.10, for plaintiff Fontella Luther in the amount of $96,611.49, and for plaintiff Rodney Jones in the amount of $111,500.00.

I.

The first action (Case No. 8:05-CV-1813-T-17TGW) was brought by the EEOC and joined by Melissa Whittaker[1] and Fontella Luther

---

[1] The plaintiff has resumed using her maiden name, Melissa Whittaker, since filing the original complaint under her married name, Melissa Everette, and will be referred to by her preferred name.

as intervening plaintiffs.[2]    The second action (Case No. 8:05-CV-2358-T-17TGW) was brought by Rodney Jones.[3]  The three individual plaintiffs were employed by the defendant, Diversified Behavioral Health Solutions, Inc.  The plaintiffs worked at the defendant's facility in Bowling Green, Florida, where the defendant operated a residential detention center for female juvenile offenders between the ages of 12-18 under a contract with the Department of Juvenile Justice.  In 2003, as a result of an additional contract being awarded to the defendant, the Bowling Green facility increased to approximately 52 juvenile residents and 52 employees.

Joshua Ford, the chief executive officer and president of the defendant company, worked at the Bowling Green facility during the individual plaintiffs' periods of employment.  Though he had a silent partner as co-owner, Ford was the highest ranking officer and the ultimate decision-maker for the defendant.

Whittaker and Luther allege that they were sexually harassed by Ford.  They further claim that they were unlawfully terminated by the

_____

[2]Docket entries in this case will be cited as "1813, Doc. ___."

[3]Docket entries in this case will be cited as "2358, Doc. ___."

defendant in retaliation for filing individual complaints about Ford's sexual harassment with the EEOC.  Jones alleges that the defendant unlawfully terminated him in retaliation for his opposition to Ford's sexual harassment of Whittaker and Luther.  These three plaintiffs gave the following testimony at the evidentiary hearing.

Plaintiff Whittaker began her employment with the defendant as a case manager assistant at the Bowling Green facility on August 1, 2002.  She was thereafter promoted to human resources director.  Her office was located close to Ford's office.  Whittaker testified that her initial impressions of, and interactions with, Ford were pleasant.  Four months after she began working for the defendant, however, Ford began to make disgusting and offensive comments to her.  According to Whittaker, beginning in December 2002 and continuing without abatement until she was terminated in 2005, she was regularly subjected to sexual harassment by Ford in the form of lewd comments, name-calling, unsolicited touching, and unwelcome exposure to sexually explicit materials.

Specifically, Whittaker testified that Ford made sexually offensive remarks whenever she worked with him.  For example, Ford often

commented on the size of men's genitals.  According to Whittaker, he once told her that even though white men had smaller genitals than black men, white men could "make up for it" by using their tongues, and proceeded to stick out his tongue and wiggle it in her direction.  Whittaker testified that, because Ford was white and he knew that her fiancé at the time was black, she found this comment particularly offensive and hurtful.  Ford also asked why she was with a black guy and told her that she should be with a white guy.  On another occasion, Ford allegedly told her that if he was not married he would like to take her out and be her "sugar daddy."

Whittaker also testified that Ford made sexually offensive remarks related to her pregnancy.  She specifically recounted one example in 2003, when she was four or five months pregnant, when Ford told her in graphic terms that he enjoyed having sex with a pregnant woman, and that he had sex with his wife all the time when she was pregnant.

According to plaintiff, Ford often addressed her using derogatory names with connotations that are demeaning to women.  For instance, Whittaker testified that he called her "chicken head" and "hoochie mama," which are slang terms implying that she is sexually promiscuous.  On another occasion, he asked if she was called "white chocolate."  Whittaker testified

that she was insulted by the name-calling and objected to it. According to Whittaker, she would tell Ford, "that's not my name, my name is Melissa," and walk away.

Whittaker maintains that she consistently let Ford know through her actions that his behavior was unwelcome. For example, Whittaker alleges that Ford subjected her to unwelcome physical contact, including rubbing her shoulders and massaging her neck and back. She testified that whenever Ford touched her, she would try to move away from him to a place where he could not touch her. Additionally, Whittaker recalled one time in which Ford called her into his office and asked her to look at his computer screen. On the screen was an e-mail depicting a woman performing fellatio. Whittaker said that she immediately walked out of his office.

Whittaker testified that she never initiated any conversations about sexual activity, never told any sexual jokes, and never indicated that his commentary or behavior was acceptable. Whittaker testified that, in accordance with the defendant's sexual harassment policy, she complained about Ford's offensive behavior to Jones, the project manager at the defendant's Bowling Green facility and second in command after Ford. Although Jones brought Whittaker's complaints to Ford's attention, Ford

continued his offensive behavior.  Whittaker testified that she took numerous complaints to Jones because the sexual harassment persisted.  She further stated that there was nothing Jones could do because Ford was Jones's boss and there was no one in a superior position to complain to other than Ford.  Thus, Ford's offensive behavior continued uncorrected.  In 2004, Whittaker filed a charge of sex discrimination against the defendant with the EEOC.

Whittaker testified that Ford's conduct negatively affected her work environment and her home life.  She testified that he made her feel "like a piece of meat" and "less than a woman."  She claims that she attempted to avoid Ford, but her job required her to communicate with him.  Whittaker also testified that she was not able to quit because she was supporting her two children and did not believe that she would be able to find another job.  She further explained that Bowling Green, a small town of three to four thousand residents, offered very few job alternatives.  She continued to work for the defendant because she felt that she had no choice.

In 2005, the defendant pre-approved Whittaker to reduce her work schedule to 30 hours per week in order to attend school.  Then she was told that her position had been eliminated and combined with another, and that, if she could not do the work, she was not needed.  On July 5, 2005, the

defendant told Whittaker that she was terminated because she had breached confidentiality by speaking to another employee about her EEOC investigation. Whittaker believes that she was fired for filing a formal complaint about Ford with the EEOC.

Plaintiff Luther suffered similar treatment from Ford while employed with the defendant. Luther began working at the defendant's Bowling Green facility on July 8, 2002, as a training coordinator. She was promoted thereafter to chief of security. As part of her promotion, she moved her office into the same area of the facility as Ford's office.

Luther testified that she initially perceived Ford's interaction with his employees as unprofessional, particularly in light of his role as president and CEO of the company. Accordingly, she tried to avoid him. However, around September or October of 2003, Ford began subjecting Luther to sexual harassment. Although Luther could not remember the specific details of each instance of Ford's offensive behavior, she testified that Ford continually behaved in an offensive manner toward her until she was terminated in September 2005. Luther's testimony provided several examples of the harassment she experienced on a regular basis.

Luther recalled one incident when Ford stopped her as she was leaving work for the day. He first asked her whether she was in a relationship with Jones, the program director at that time. She replied that she was not. Then Ford asked her to look down, and when she did, she saw that his pants were wet in the genital area. She surmised that Ford had ejaculated on himself during their conversation. He told her to touch it, and said "look what you do to me." Luther testified that she was appalled and disgusted, and left immediately.

According to Luther, Ford would verbally harass her by sexually propositioning her or making sexually suggestive comments about her and other employees. Luther testified that Ford often talked about the size of men's genitals. He told her that white men have smaller genitals than black men, but that white men "make up for it with their tongues." She further testified that he once asked her to participate in a threesome with another co-worker.

Ford's use of vulgar and lewd language added to Luther's discomfort and distress over Ford's offensive sexual remarks. As an example, Luther recalled one occasion when she was preparing to attend a training event with several fellow employees in another city. Using sexually obscene

language, Ford said that he knew that the only thing the employees would be doing on the trip would be having intercourse with each other.  Luther testified that she was mortified, and directly told Ford not to talk to her that way.  Also, when Ford saw her cleaning the cage of the program's pet snake one day, Ford told Luther that he needed to make her his bitch.  Luther testified that she was offended, and again told Ford not to talk to her like that.

According to Luther's testimony, Ford's harassment was not confined to the workplace.  Luther said that Ford once called her at home in the evening.  During that phone conversation, Ford speculated on the size of male employees' genitals and even suggested that one employee's small genitals led his wife to become pregnant by the milkman.  Luther testified that she was repulsed at his statements, and insisted that she did not do anything to provoke or encourage his behavior.

Luther also testified to Ford's unwelcome physical contact. Thus, Luther stated that Ford would massage her shoulders and comment that she seemed tense.  Luther contended that she never asked him to touch her. Whenever Ford would touch her, she would shake him off, tell him to get his hands off of her, and walk away.

Luther testified that, as a result of Ford's continual harassment, she experienced mental and emotional distress. She said that she often felt disrespected, angry, embarrassed, and hurt. As a woman, she could not do the job that she was hired to do because of Ford's interference. She tried to avoid Ford. However, such efforts were made virtually impossible by the circumstances of her position, which required communication with Ford, and the location of her office, which was close to Ford's office.

Ford's harassment also negatively affected Luther's home life. She testified that she felt stressed and angry, and also had difficulty resting. She never wanted to discuss her work with her children. Nevertheless, as a single parent of three boys, Luther continued to work to support her family.

Luther testified that, in accordance with the defendant's sexual harassment policy, she complained to Jones about Ford's behavior numerous times during the course of the harassment. Although Jones spoke with Ford about Luther's allegations of sexual harassment, Jones lacked the authority to enforce Ford's compliance. Thus, Ford's behavior continued unabated.

After Jones was terminated in October 2004, Luther was promoted to program director. Accordingly, she assumed Jones's responsibility for investigating allegations of sexual harassment. Even though

the defendant had a sexual harassment policy in place, the policy was ineffective as a means of sanctioning Ford's behavior because it did not adequately address what to do in the event that the president was the alleged harasser. Under these circumstances, the only person to whom Luther could report Ford's harassment was Ford himself.

Luther also testified that she learned of another female employee who was enduring Ford's offensive conduct. In addition, Luther became concerned that Ford might act inappropriately with the female juveniles housed at the Bowling Green facility. Consequently, in January 2005, Luther filed a formal complaint with the EEOC against the defendant.

On September 29, 2005, Luther was terminated by the defendant. According to Luther, the defendant alleged that she violated some work rules. Luther testified that the defendant was aware of her EEOC complaint at the time she was terminated. Luther contends that she was fired because she filed a charge of sexual harassment with the EEOC.

Plaintiff Jones was hired by the defendant in July 2002.[4]  He became program director for the Bowling Green facility. Ford, as president

---

[4]Jones testified at the hearing that he began work at the facility in July 2004. However, that appears to be a misstatement as he began working as the program director in 2002 (see 2358, Doc. 1, p. 2).

of the company, was Jones's direct supervisor.   Jones's responsibilities included receiving and investigating complaints of sexual harassment.  Under the defendant's policy, employees reported complaints to Jones, who would then interview the parties involved and any witnesses.  However, as Jones pointed out, this policy did not set out a procedure to be followed when the company president was the subject of an investigation.

Jones testified that Whittaker and Luther individually complained about Ford's inappropriate and offensive behavior.   The first complaint he recalled was regarding Ford's comment about making Luther his bitch while she was cleaning out the snake cage.  Luther further complained several times about Ford's behavior, including his attempt to have her touch his wet pants and about his unsolicited massages.  Jones testified that, like Luther, Whittaker complained regularly about Ford's offensive conduct.  Jones said that he had seen Ford enter Whittaker's office and close the door.  When Ford exited the office, Jones could see from the look on Whittaker's face that something had happened and Whittaker would tell him that he had to do something about Ford.

Jones explained that, upon initially receiving complaints about Ford's behavior, he broached the complaints with Ford in an informal manner

in the hope that Ford would get the message and change his behavior.  Jones did not want to push the matter because he was afraid of what might happen. According to Jones, Ford denied the allegations and said that he would take care of it.  However, Ford failed to stop the harassment.  As the complaints became more regular, Jones was forced to use a more direct approach.  Jones recalled confronting Ford on at least four or five occasions.

Jones testified that, after he had spoken with Ford a few times about the complaints, Ford's demeanor toward Jones changed abruptly.  He was no longer congenial.  Ford distanced himself from Jones and stopped communicating freely.  At this point, Jones could see the writing on the wall. Jones testified that his belief that he would soon be fired encouraged him to hound Ford to stop his sexual harassment of Whittaker and Luther.

Jones further testified that the tense situation between his boss and his female subordinates caused Jones tremendous stress that affected his work and his home life.  As a result of Jones's admonitions, Ford no longer communicated with him, thus hampering his ability to run the program.  Jones also stated that the milieu of the workplace changed, becoming stressful.  In addition, Jones felt tremendous stress due to the work environment and his inability to help his female subordinates by stopping the harassment.  He felt

especially guilty for encouraging Luther to seek employment with the defendant.

In particular, Jones felt stressed at the possibility of losing his job. Jones was unable to ignore his problems at work when he was at home. Although he was certain that his termination was imminent, he was constantly wondering when and how it would occur. Moreover, as the father of two sons, the prospect of losing his means of financial support added to his mental distress.

Subsequently, the defendant terminated Jones on October 4, 2004. Jones filed a timely complaint with the EEOC, charging the defendant with unlawful retaliatory discharge in response to his opposition of Ford's sexual harassment. The EEOC issued Jones a Notice of Right to Sue on September 26, 2005 (2358, Doc. 1, Ex. B).[5]

In response to charges filed by Whittaker and Luther, on September 29, 2005, the EEOC filed the present action in this court, alleging that the defendant violated Title VII by maintaining a gender-based hostile

---

[5]The EEOC's determination explained that the defendant allegedly terminated Jones after Jones was accused of sexually harassing a female employee (2358, Doc. 1, Ex. A). The EEOC's determination states that, although Jones "did not sexually harass the female as accused, he was nevertheless terminated for it by Ford in retaliation for engaging in protected activity" (id.).

work environment (1813, Doc. 1).  On December 8, 2005, the defendant filed an answer to the original complaint (id., Doc. 12).   Subsequently, Whittaker and Luther moved to intervene as plaintiffs and that motion was granted (id., Doc. 14).  The intervenors' complaint alleged sexual harassment in violation of Title VII (Count I) and the Florida Civil Rights Act (Count II) (id., Doc. 18).  The intervening plaintiffs thereafter filed an amended complaint, adding a claim of retaliation (id., Doc. 52).  The defendant filed an answer to the intervenors' initial complaint, but did not answer the amended complaint.

Also, on December 23, 2005, plaintiff Jones filed a two-count complaint with this court, contending that the defendant had engaged in unlawful employment practices and that he was terminated in retaliation for his opposition to the defendant's discriminatory practices (2358, Doc. 1).  Jones sought relief under Title VII (Count I) and the Florida Civil Rights Act (Count II) (id.).  The defendant filed an answer to Jones's complaint (id., Doc. 7).

Subsequently, defendant's counsel filed a motion to withdraw from representation in both cases.  On August 29, 2006, an Order was entered in each case staying the matters for sixty days so that the defendant could obtain new counsel, and deferring the motion to withdraw until the defendant's new counsel had filed an appearance.  After sixty days had lapsed without an

appearance of new counsel, the defendant's attorney filed a renewed motion to withdraw.  On November 7, 2006, United States District Judge Elizabeth A. Kovachevich entered an Order to Show Cause in both cases, allowing the defendant eleven days to explain why sanctions should not be entered for the defendant's failure to comply with Local Rule 2.03 requiring appearance of counsel.  Those Orders warned that a failure to respond would indicate to the court that the defendant was abandoning these cases and that a default judgment would be entered against it.  No appearance of counsel was subsequently filed in either case.

Consequently, the EEOC filed a motion for default judgment against the defendant in accordance with Rule 55, Fed. R. Civ. P. (1813, Doc. 49).  Judge Kovachevich entered an Order referring the matter to me for an evidentiary hearing and a report and recommendation concerning the entry of a default judgment (id., Doc. 53).  On January 24, 2007, I entered an Order directing the Clerk to enter a default against the defendant (id., Doc. 54). Accordingly, an evidentiary hearing was scheduled to hear testimony and consider evidence supporting Whittaker's and Luther's damage claims.

Meanwhile, the case of plaintiff Jones, formerly assigned to United States Magistrate Judge Mary S. Scriven, was reassigned to me on

January 18, 2007 (2358, Doc. 21).  Shortly thereafter, Judge Kovachevich

entered an Order referring the case to me for an evidentiary hearing and report

and recommendation on sanctions for the failure to respond to the Order to

Show Cause (id., Doc. 22).  Subsequently, Jones filed a motion for the entry

of a default judgment (id., Doc. 23).  On February 7, 2007, I entered an Order

directing the entry of a default against the defendant (id., Doc. 24).

Jones's claim for damages was scheduled for an evidentiary

hearing along with the claims by Whittaker and Luther.  A few days before the

hearing, the court received a letter from Ford stating that the defendant was

unable to defend these lawsuits (1813, Doc. 66; 2358, Doc. 30).  Accordingly,

the defendant failed to appear and defend the cases.  Nevertheless, the

testimony previously summarized was received at the hearing.

## II.

Each of the three plaintiffs seeks an award of back pay, non-

economic compensatory damages and punitive damages.[6]  The plaintiffs

request damages under Title VII, acknowledging that an award of damages

_____

[6]In their complaints, the plaintiffs also request injunctive relief (1813, Doc. 1, p. 4; Doc. 18, p. 6;  Doc. 52, p. 6; 2358, Doc. 1, p. 4).  At the hearing, however, plaintiffs' counsel only discussed back pay, compensatory damages, and punitive damages. Moreover, counsel acknowledged that, because the defendant is no longer in operation, the issue of injunctive relief is moot.

under both the Florida Civil Rights Act and Title VII would result in an impermissible double recovery.  If a plaintiff recovers an element of damages under one theory of liability, he or she is not entitled to recover for that same element of damages under a different statutory claim of liability.  Westerman v. Sears Roebuck and Co., 577 F.2d 873, 879 (5th Cir. 1978).  At the hearing, the plaintiffs' attorneys indicated that they would seek the statutory maximum amount of compensatory and punitive damages allowable for Title VII violations.

A.  Back pay is an equitable remedy available to compensate an employee who has been discharged as a result of intentional employment discrimination. 42 U.S.C. 2000e-5(g)(1).  Back pay is "the difference between the actual wages earned and the wages the individual would have earned in the position that, but for the discrimination, the individual would have attained." Akouri v. State of Florida Dept. of Transp., 408 F.3d 1338, 1343 (11th Cir. 2005) (quoting Gunby v. Pennsylvania Electric Co., 840 F.2d 1108, 1119-20 (3d Cir.1988)).  The three plaintiffs have not asked for pre-judgment interest on their respective back pay claims.  Nor have they requested future pay.  In addition, the three plaintiffs found new jobs within a reasonable period of time

after they were terminated by the defendant, thereby mitigating the amount of back pay recoverable under the statute.

In support of Whittaker's claim for back pay, she testified to the difference between the amount she would have earned if she had continued to be employed by the defendant and the amount she has actually earned since she was fired by the defendant on July 5, 2005.  To compute her amount of lost wages, she multiplied her estimated monthly salary by the number of months since she was fired on July 5, 2005, which amounts to $36,330 in lost wages. She has subsequently become employed by Polk County, beginning June 30, 2006.  Working for Polk County, she earned $23,943.90 from June 30, 2006, to May 31, 2007.  Thus, the difference between her estimated lost wages and her actual earnings is $12,386.10.  As I found her testimony credible and her claim reasonable, I recommend that Whittaker be awarded $12,386.10 in back pay.

Luther also testified with respect to her claim for back pay.  At the time of her termination, September 29, 2005, she was earning $3,777.16 per month.[7]   If Luther had continued to work for the defendant from September 2005 to the date of the hearing, she would have earned $79,320.36.  Luther

---

[7]Luther earned $33,994.48 from the defendant from January 2005 to September 2005.

was able to find subsequent employment at Wal-Mart, beginning in January 2006. She earned $20,128.65 in 2006, and $11,481.95 in 2007 to the time of the hearing. By subtracting the actual wages earned at Wal-Mart from the estimated amount of wages that she would have earned working for the defendant, the amount of lost wages totals $46,611.49. Luther's testimony appeared credible and the amount requested seems reasonable.

In addition, Jones requests back pay in the amount of $81,500. Jones testified that he earned approximately $47,500 a year, or $4000 per month, while employed by the defendant. If he had continued to work for the defendant at that rate of pay, Jones would have earned about $126,000 from the date of his termination until the date of the hearing. After he was terminated in October 2004, Jones became self-employed and began working in conjunction with the local Department for Community Affairs to bolster the community infrastructure through grass roots efforts. In 2005 and 2006, he earned roughly $18,000 per year, and in 2007 he had earned $9,000 by the time of the hearing. In total, Jones has earned about $45,000 since he was terminated. Jones arrived at his back pay claim amount of $81,500 by subtracting his recent earnings from the estimated amount that he would have earned had he not been fired by the defendant. Jones's testimony was credible

and his requested amount of back pay, although not a precise figure, is an adequate and fair approximation.  I recommend that Jones be awarded $81,500 in back pay.

B.  Under Title VII, non-economic compensatory damages are available to individuals subjected to intentional discrimination.  42 U.S.C. 1981a.  Section 1981a provides that compensatory damages may be awarded for "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." 42 U.S.C. 1981a(b)(3).  Statutory limitations are imposed on the amount of compensatory damages recoverable for Title VII violations.  42 U.S.C. 1981a(b)(3)(A).  At the hearing, the plaintiffs' attorneys asked for the maximum amount recoverable against the defendant under 42 U.S.C. 1981a, which is $50,000 per plaintiff for combined compensatory and punitive damages.[8]  Id.  Specifically, at the hearing each plaintiff requested $25,000 in compensatory damages.

In support of her claim, Whittaker testified that she was afflicted with constant stress.  She also expressed self-consciousness because she felt powerless and less than a woman as a result of Ford's sexual harassment.

---

[8]The amount of $50,000 is expressly prescribed for employers, like the defendant, who employed "more than 14 and fewer than 101 employees in each of 20 or more calendar weeks in the current or preceding calendar year."  42 U.S.C. 1981a (b)(3)(A).

Although her job required her to communicate regularly with Ford, she often tried to avoid him.  Consequently, her job performance suffered.  She said that his behavior made her feel "like a piece of meat."  Whittaker also expressed a sense of helplessness resulting from Jones's inability to correct Ford's behavior and her belief that she had no choice but to continue working for the defendant because of the limited job opportunities in her small community. Whittaker further testified that she worried that she took out her stress and frustration on her two children.

Whittaker has requested non-economic damages in the amount of $25,000.  Whittaker is entitled to significant compensation for enduring Ford's harassment.  Her testimony appeared credible and supported her claim of mental anguish and emotional distress.  Under the circumstances, an award of $25,000 for Whittaker's emotional distress seems reasonable.

Similarly, Luther requests $25,000 in non-economic damages. She testified that Ford's conduct caused her significant stress and emotional distress.  She stated that, because of Ford's offensive comments and actions, she felt disrespected, violated, angry, embarrassed, and hurt.  Luther felt that she could not adequately perform her job at the Bowling Green facility due to Ford's interference.  Luther testified that Ford's behavior also negatively

affected her home life.  When she came home from work, she was often angry, had difficulty resting, and did not want to discuss her day at work.

The evidence of Ford's behavior supports an award of $25,000 in compensatory damages for Luther's mental anguish and emotional distress. Luther's testimony included examples of the harassment she experienced on a regular basis.  She testified that Ford often called her insulting names.  Ford engaged in unwelcome and unsolicited physical contact by massaging her shoulders and neck.  Luther claims that she let Ford know, through words and actions, that she objected to his behavior.

Ford's sexual harassment of Luther was sufficiently severe and pervasive to create a hostile work environment that caused her substantial mental anguish and emotional distress.  Her testimony appeared credible and her claim seems reasonable.  Therefore, I recommend that Luther be awarded $25,000 in compensatory damages.

Jones testified as to the mental and emotional distress he suffered because of his opposition to Ford's discriminatory treatment of plaintiffs Whittaker and Luther.  Jones does not allege that he was the victim of gender discrimination.  Thus, he did not testify to any mental anguish arising from

being treated differently than the female employees working at the Bowling Green facility.

It appears that Jones's emotional distress was generated principally by his fear of losing his job. Jones is clearly entitled to some compensatory damages for the emotional distress resulting from his opposition. According to Jones, the distress caused by his opposition included the stress of confronting his boss, the anxiety associated with being unjustly terminated, his frustration with his inability to prevent his boss from harassing his fellow employees and friends, and his concern for those employees and friends.

Jones testified that the Bowling Green facility became a stressful environment and his job became more difficult because he felt a personal and professional obligation to his female subordinates to stop Ford's sexual harassment. Jones was under substantial stress because he was forced to act as a mediator between his boss and the employees who were depending on him. Jones said it was difficult to interact with Ford at work because Ford was giving him the cold shoulder. He also stated that he felt particularly guilty about Luther's experience with Ford because Jones had encouraged her to work for the defendant.

It is apparent that the defendant recklessly disregarded Jones's federally protected rights under Title VII. Retaliation against those who oppose unlawful employment practices is rightly considered a serious act and should be dealt with accordingly. However, Jones was not personally subjected to Ford's offensive behavior. His testimony did not indicate that he suffered severe emotional distress. Thus, he is not entitled to the same amount of non-economic damages that are justified for Whittaker and Luther, who were the victims of Ford's harassment. Under the circumstances, I recommend that Jones be awarded $10,000 in compensatory damages.

C. Section 1981a of the Civil Rights Act of 1991 also authorizes an award of punitive damages in certain situations. 42 U.S.C. 1981a(b)(1). Punitive damages are available where the defendant "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." Id. The statutory limitation on the sum of compensatory and punitive awards recoverable by each plaintiff is $50,000. 42 U.S.C. 1981a(b)(3)(A). On the element of punitive damages, each plaintiff seeks an award of $25,000.

Whittaker's and Luther's individual requests for $25,000 in punitive damages appear reasonable. While working for the defendant,

Whittaker was regularly subjected to Ford's behavior, including crude comments and gestures, unwelcome physical contact and exposure to sexually graphic material on Ford's computer.   Luther was likewise subjected to sexually harassing conduct by Ford, including numerous obscene comments and gestures, name-calling, unwelcome physical contact, offensive speculation about her and other employees' relationships, and one particularly offensive incident in which he asked her to touch the crotch of his pants.  Ford's conduct created a stressful workplace in which the plaintiffs often felt violated, embarrassed and upset.

It is apparent that Whittaker and Luther suffered a violation of their Title VII rights that would enable them to recover punitive damages. Their individual complaints about Ford's harassment went uncorrected.  Jones testified that he addressed their complaints with Ford on several occasions, but Ford failed to change his behavior.   Although Whittaker and Luther complained routinely, Jones was powerless to deter Ford from continuing the harassment because, as previously stated, Ford was Jones's boss.  In fact, as the president of the company, Ford answered to no one.  Thus, although the defendant was aware of the sexual harassment allegations, it did not address Whittaker's and Luther's complaints.

Whittaker and Luther both testified that they suffered substantially from mental anguish and emotional distress caused by Ford's sexual harassment and that, despite their complaints, Ford would not stop. Consequently, their unrebutted testimony demonstrates that the defendant egregiously disregarded their statutory rights.  Thus, it seems reasonable to award Whittaker and Luther punitive damages in the amount of $25,000 each. An award of punitive damages in that amount, combined with an award of $25,000 in compensatory damages, would result in the maximum award available to Whittaker and Luther for those elements of damages.

Jones also requests an award of $25,000 in punitive damages. The evidence clearly demonstrates that Jones engaged in opposition to Ford's sexual harassment, and that the defendant retaliated for that opposition. Accordingly, the defendant should be punished for that retaliation. However, in my view, the punishment for such conduct should not be as great as the punishment imposed for engaging in sexual harassment, which, at least in this case, is the more pernicious behavior.  Therefore, I recommend that Jones be awarded $20,000 in punitive damages.

III.

For the foregoing reasons, I recommend that Whittaker be awarded $12,386.10 in back pay, $25,000 for emotional distress, and $25,000 in punitive damages, for a total of $62,386.10.   Further, I recommend that Luther be awarded $46,611.49 in back pay, $25,000 for emotional distress, and $25,000 in punitive damages, for a total of $96,611.49.   Also, I recommend that Jones be awarded $81,500 in back pay, $10,000 for emotional distress, and $20,000 in punitive damages, for a total of $111,500.

The Clerk is directed to send a copy of this Report and Recommendation to the defendant.

Respectfully submitted,

THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE


DATED: SEPTEMBER 27, 2007

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal.   28 U.S.C. 636(b)(1).